UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA </br></br> Plaintiff, </br></br> v. </br></br> KIRBY INLAND MARINE, L.P. </br></br> Defendant. | Civil Action No. 3:16-cv-269 |

# COMPLAINT

The United States of America, by the authority of the Attorney General of the United States, acting at the request of the United States Coast Guard, files this Complaint and alleges the following:

## NATURE OF THE ACTION

1. This is a civil environmental enforcement action against Kirby Inland Marine, L.P., for violation of the Clean Water Act ("CWA"). The United States seeks civil penalties and injunctive relief in connection with the unlawful discharge of oil into the Houston Ship Channel from a vessel owned and operated by Kirby. The oil spill occurred on March 22, 2014, after a Kirby towboat pushing two Kirby oil barges tried to cross in front of a 585-foot-long deep-draft bulk cargo ship that was traveling in the Houston Ship Channel. The lead Kirby oil barge was struck and approximately 4,000 barrels (168,000 gallons) of heavy marine fuel oil spilled into the waters of the Houston Ship Channel. The oil flowed out of the Channel and spread down the Texas coastline. Approximately 160 miles of shoreline were oiled as a result of the spill, including sensitive marsh habitat, the national wildlife refuge on Matagorda Island, Mustang

Island State Park, and Padre Island National Seashore. Additionally, the Houston Ship Channel was closed to navigation for five days, and cleanup and damage assessment efforts continued for months.

2.   The United States brings claims for civil penalties and injunctive relief for the oil spill under CWA Section 311(b) and (e), 33 U.S.C. § 1321(b) and (e).

## JURISDICTION AND VENUE

3.   This Court has jurisdiction over this matter pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n); and 28 U.S.C. §§ 1331, 1345, and 1355.

4.   Authority to bring this action on behalf of the United States is vested in the United States Department of Justice by, *inter alia*, 28 U.S.C. §§ 516 and 519.

5.   Venue is proper in the Southern District of Texas pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), and 28 U.S.C. §§ 1391 and 1395 because the claims arose in this district and Defendant is located and doing business in this district.

## THE PARTIES

6.   Plaintiff United States of America is acting at the request of the Coast Guard.

7.   The Coast Guard served as the lead federal agency in the oversight of the oil spill response and cleanup efforts.

8.   Defendant is a Texas limited partnership that owns and operates the *Miss Susan* towboat and the oil barges involved in the collision and oil spill.

## STATUTORY BACKGROUND

9.   Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), prohibits the "discharge of oil or any hazardous substances (i) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone . . . in such quantities as

may be harmful . . . ."

10. Pursuant to Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), as of the date of the oil spill at issue, "[a]ny person who is the owner, operator, or person in charge of any vessel . . . from which oil . . . is discharged in violation of [Section 311(b)(3)], shall be subject to a civil penalty in an amount up to [$37,500] per day of violation or an amount up to $[2,100] per barrel of oil . . . ." *See also* 40 C.F.R. § 19.4 (listing these updated penalty rates).

11. For the oil spill at issue, civil penalties can be increased up to $5,300 per barrel discharged pursuant to Section 311(b)(7)(D) of the CWA, 33 U.S.C. § 1321(b)(7)(D), if the violation was the result of "gross negligence or willful misconduct." *See* 40 C.F.R. § 19.4.

12. Enforcement of Section 311 of the CWA supports the national objective to prevent and deter oil spills and "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §§ 1251(a), 1321(b)(1).

## **FACTS**

13. Defendant owns and operates the towboat the *Miss Susan*.

14. The *Miss Susan* measures 70 feet long, 28 feet across, and 10 feet deep, and is an 1,800-horsepower towing vessel weighing 131 gross tons.

15. Defendant owns and operates the oil barges the *Kirby 27705* and the *Kirby 27706*.

16. The *Kirby 27706* measures 300 feet long, 54 feet across, and 12 feet deep.

17. The *Kirby 27706* is a double-hulled marine barge outfitted with several 4,000-barrel storage tanks, capable of carrying liquid petrochemical products, including oil.

18. The marine vessel the *Summer Wind* is a deep-draft bulk cargo ship that measures 585 feet long, 100 feet wide, and 52.5 feet deep, and weighs 25,503 gross tons.

19. At approximately 11:15 a.m. on March 22, 2014, the *Miss Susan* departed from

the port at Texas City, bound for Port Bolivar, Texas, to await berth availability at the final destination of Galveston, Texas.

20. When the *Miss Susan* departed the port at Texas City, the vessel was pushing the *Kirby 27706* and the *Kirby 27705*, and the three vessels were lined up in an end-to-end configuration with *Kirby 27706* in the lead position, for a total length of approximately 670 feet.

21. On the morning of March 22, 2014, the *Kirby 27705* and the *Kirby 27706* were each loaded with approximately 22,500 barrels of heavy marine fuel oil.

22. By approximately 12:15 p.m. on March 22, 2014, the *Miss Susan* was approaching the busy "Texas City Y" area, which is where the Houston Ship Channel, the Texas City Channel, the Bolivar Roads Channel, and the Intracoastal Waterway intersect.

23. On the morning of March 22, 2014, before and at the time of the spill, there was significantly reduced visibility in the Texas City Y area due to fog.

24. Due to the poor visibility in the Texas City Y area, at about 7:00 a.m. on the morning of March 22, 2014, the Houston Pilots Association had suspended pilot boardings of inland-bound deep-draft vessels.

25. At approximately 12:00 p.m., the *Summer Wind* was the first deep-draft vessel authorized to depart, after the 7:00 a.m. suspension of pilot boardings set by the Houston Pilots Association, from anchorage inbound toward Houston.

26. As a deep-draft cargo vessel, the *Summer Wind* is supposed to navigate in the Texas City Y area only in the confines of the ship channels. Pursuant to applicable Inland Navigation Rules, the *Summer Wind* had the right of way in the Houston Ship Channel as between it and the *Miss Susan*.

27. It is customary for vessels navigating in and around the Texas City Y area to

broadcast their navigation plans and to make passing arrangements via radio channel 13.

28. At approximately 12:10 p.m., the pilot of the *Summer Wind* made a radio call over channel 13 wherein he indicated that the ship was leaving anchorage inbound to Houston. The *Summer Wind* was also visible on navigational monitoring instruments, including those onboard the *Miss Susan*.

29. At approximately 12:24 p.m., the *Miss Susan*, which had been traveling eastbound in the Texas City Channel, commenced a port turn into the current in order to prepare to cross the Houston Ship Channel.

30. At the time that the *Miss Susan* and the Kirby barges were approaching the Houston Ship Channel, the waterway was influenced by a "flood tide" of approximately 1 knot. The resulting current acted as a drag on the *Miss Susan* and the Kirby barges, slowing their speed.

31. Also at that time, fog was still present in the intersection of the Houston Ship Channel where the *Miss Susan* intended to cross and the *Summer Wind* was approaching.

32. At about 12:25 p.m., the *Summer Wind* was approaching the area of the Houston Ship Channel that the *Miss Susan* was attempting to cross, moving at a speed of almost 10 knots, and a "close quarters" situation was developing between the vessels.

33. At approximately 12:29 p.m., the captain of another tow operating in the area, the *Mission*, radioed the *Miss Susan* and provided a further alert to the situation. The *Mission* asked, "[h]ey you going to be [. . .] beating [the *Summer Wind*] across the intersection there?" The *Miss Susan* responded, "I'm going to be crossing the intersection there in a minute, over." The *Mission* captain replied, "[y]eah, that's what I'm saying, you going to beat him across? Are you gonna be across before [the *Summer Wind*] gets down here?" The *Miss Susan* stated, "Roger."

5

34. It was not until around 12:31 p.m. that the *Miss Susan* made its first direct communication with the *Summer Wind* over radio channel 13.

35. At approximately 12:32 p.m., the pilot of the *Summer Wind* responded to the *Miss Susan* over the radio that, "if you keep on going, I'm going to get you unless you're doing about 7 or 8 knots 'cause right now I'm less than three quarters of a mile from you [and] you ain't got to the [Houston Ship Channel] yet."

36. At the time the vessels were approaching one another, the *Miss Susan*'s speed had slowed considerably under the influence of the flood tide, to approximately 3.5 knots.

37. At about 12:35 p.m., the *Summer Wind*'s bow struck the lead barge, the *Kirby 27706*, halfway down its starboard side. Oil began leaking from the barge into the waterway immediately thereafter.

38. Kirby's conduct proximately caused the March 22, 2014, oil spill. The collision and oil spill could have been avoided had Kirby's vessels not tried to cross in front of the *Summer Wind* in the Houston Ship Channel at the time and under the conditions that it did so.

39. The Coast Guard's Inland Navigation Rules are set forth in 33 C.F.R. Part 83. Pursuant to 33 C.F.R. § 83.09(d), "[a] vessel must not cross a narrow channel or fairway if such crossing impedes the passage of a vessel which can safely navigate only within such channel or fairway." Pursuant to 33 C.F.R. § 83.08(f)(i), "[a] vessel which . . . is required not to impede the passage or safe passage of another vessel shall, when required by the circumstances of the case, take early action to allow sufficient sea room for the safe passage of the other vessel."

40. Kirby operated the *Miss Susan*, the *Kirby 27705*, and the *Kirby 27706* in such a way as to impede the passage or safe passage of the *Summer Wind* by attempting to cross the Houston Ship Channel in front of the *Summer Wind* without taking adequate early action and

without allowing adequate sea room for safe passage of the *Summer Wind*, which Kirby knew was a deep-draft vessel that could safely navigate at the time only within the deep channel of the Houston Ship Channel.

41.  The impact of the collision ruptured the hull of the *Kirby 27706* and the barge released approximately 4,000 barrels of heavy marine fuel oil into the waterway.

42.  Oil subsequently spread with the currents and winds into the Gulf of Mexico and south along Galveston Island and down the Texas coastline as far south as Padre Island National Seashore.

43.  At least 160 miles of Texas shoreline, including multiple environmentally sensitive areas, were contaminated by Kirby's oil spill just as the migratory shorebird season was approaching.

44.  One of the most sensitive areas that was significantly impacted by the spill was the Matagorda Island Unit of the Aransas National Wildlife Refuge. Matagorda Island is a 38-mile-long barrier island located over 120 miles southwest of Galveston that contains about 26,000 acres of salt marsh and tidal flats and supports a wide variety of migratory birds, including federally listed threatened or endangered species such as the critically endangered Whooping Crane.

45.  The day of the oil spill, the Coast Guard Captain of the Port ordered the Houston Ship Channel closed to prevent wakes of large vessels from moving oil toward the shorelines.

46.  The Houston Ship Channel remained closed for five days as a result of the oil spill, and cleanup and damage assessment efforts continued for months along the Texas coast.

47.  Kirby has a history of collisions and spills before and after this spill.

## CAUSES OF ACTION

**Civil Penalties and Injunctive Relief for Violation of CWA Section 311(b) and (e), 33 U.S.C. § 1321(b) and (e)**

48. The preceding paragraphs are incorporated herein.

49. Defendant is the "owner or operator" of the *Kirby 27706*, within the meaning of Section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6).

50. Defendant is a "person," within the meaning of Section 311(a)(7) of the CWA, 33 U.S.C. § 1321(a)(7).

51. Defendant is the "owner, operator, or person in charge" of the *Kirby 27706*, within the meaning of Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A).

52. The *Kirby 27706* is a "vessel" within the meaning of Section 311(a)(3) of the CWA, 33 U.S.C. § 1321(a)(3).

53. The spilling of oil from the *Kirby 27706* constitutes a "discharge" of oil within the meaning of Section 311(a)(2) of the CWA, 33 U.S.C. § 1321(a)(2).

54. The discharge was of heavy marine fuel oil, which is "oil" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1).

55. The Houston Ship Channel is a "navigable water of the United States" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

56. Defendant's oil discharge caused a sheen upon and discoloration of water surfaces and adjoining shorelines of the Houston Ship Channel and other waters, and caused sludge or emulsion to be deposited beneath the surface of the waters and upon miles of adjoining shorelines. Thus, the quantity discharged was of a quantity "as may be harmful" within the meaning of Section 311(b)(3) and (4) of the CWA. 33 U.S.C. § 1321(b)(3) and (4); 40 C.F.R. § 110.3.

57. Defendant's discharge of oil violated Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

58. Defendant is liable for civil penalties of up to $2,100 per barrel discharged under CWA Section 311(b)(7)(A), 33 U.S.C. § 1321(b)(7)(A), or up to $5,300 per barrel discharged under Section 311(b)(7)(D), 33 U.S.C. § 1321(b)(7)(D), if it is proven that the violation was the result of gross negligence or willful misconduct. *See* 40 C.F.R. § 19.4 (listing these updated penalty rates for violations that occur after December 6, 2013, as required by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Pub. L. 101-410), as amended by the Debt Collection Improvement Act of 1996).

59. In addition to civil penalties, the United States seeks injunctive relief to prevent future injuries or discharges of oil from Kirby vessels.

60. Section 311(e) of the CWA authorizes the Coast Guard to address "imminent and substantial threat[s] to the public health or welfare of the United States, including fish, shellfish, and wildlife, public and private property, shorelines, beaches, habitat, and other living and nonliving natural resources under the jurisdiction or control of the United States, because of an actual or threatened discharge of oil or a hazardous substance from a vessel or facility in violation of [Section 311(b)]." 33 U.S.C. § 1321(e).

61. Section 311(e)(1)(A) of the Act authorizes the Attorney General to secure "any relief from any person . . . as may be necessary to abate such endangerment." 33 U.S.C. § 1321(e)(1)(A). District courts have "jurisdiction to grant any relief under this subsection that the public interest and the equities of the case may require." 33 U.S.C. § 1321(e)(2).

62. The risk of future collisions and oil spills involving Kirby' large fleet of vessels, coupled with Kirby's history of collisions and spills, poses an imminent and substantial threat of

9

injury to public health or welfare.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Enter judgment that Defendant is liable to the United States for civil penalties pursuant to 311(b) of the Clean Water Act, and assess civil penalties of up to $2,100 per barrel discharged, or up to $5,300 per barrel discharged if it is proven that the violation was the result of gross negligence or willful misconduct, pursuant to Section 311(b)(7)(A) or (D);

B.    Enter judgment that Defendant is liable to the United States for all appropriate injunctive relief pursuant to Section 311(e)(1) of the Clean Water Act and award injunctive relief against Defendant as appropriate;

C.    Award the United States its costs of this action; and

D.    Award the United States such other and further relief as the Court deems just and proper.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA:

*[signature]*

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*Jason T. Barbeau*
JASON T. BARBEAU, Attorney-in-Charge
Senior Trial Attorney (D.C. Bar No. 468200)
EMILY C. POWERS
Trial Attorney (N.Y. Bar No. 5132204)
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 616-8908
Fax: (202) 616-6584
E-mail: jason.barbeau@usdoj.gov

KENNETH MAGIDSON
United States Attorney
Southern District of Texas

DANIEL DAVID HU
Chief, Civil Division (Texas Bar No. 10131415)
United States Attorney's Office
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, TX 77002
Phone: (713) 567-9518
E-mail: daniel.hu@usdoj.gov

OF COUNSEL:

LT GRETAL KINNEY
Legal Counsel
United States Coast Guard, District 8
500 Poydras Street
New Orleans, LA 70130

LCDR CHRISTOPHER L. JONES
Legal Counsel
Office of Claims and Litigation
Coast Guard Headquarters
2703 Martin Luther King Jr. Ave. SE
Washington, DC 20593-7213